IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 14, 2020 Session

## STATE OF TENNESSEE v. MICHAEL WRIGHT

**Appeal from the Criminal Court for Davidson County**
**No. 2018-B-1127    Monte Watkins, Judge**

_____

### No. M2019-00082-CCA-R3-CD

_____

In a sealed indictment, the Defendant-Appellant, Michael Wright, was charged by a Davidson County grand jury with alternative counts of first-degree premeditated murder and murder in the perpetration of or attempt to perpetrate a robbery of Gregory "Pee Wee" Johnson (counts one and two), and first-degree premeditated murder of Daresha Cole (count three). A petite jury convicted the Defendant as charged of felony murder in count one and first-degree premeditated murder in count three, for which he received consecutive sentences of life imprisonment. In this appeal as of right, the Defendant raises the following issues for our review: (1) whether the trial court erred in denying the Defendant's motion to dismiss based on a violation of the Interstate Compact on Detainers (ICD); (2) whether the trial court erred in denying the Defendant's motion to sever offenses; (3) whether the trial court erred in admitting the Defendant's social media posts; (4) whether the evidence is sufficient to sustain the Defendant's convictions; and (5) whether the trial court erred in imposing consecutive sentencing. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and J. ROSS DYER, JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the Defendant-Appellant, Michael Wright.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Kristen Kyle-Castelli, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This case stems from the shooting deaths of two victims, Gregory "Pee Wee" Johnson and Daresha Cole, who were in a romantic relationship. Upon learning that victim Johnson was involved with other women or being "messy," the State theorized that victim Cole wanted retribution and arranged to have victim Johnson robbed by the Defendant. At 10:32 p.m. on February 23, 2014, as the Defendant approached victim Johnson's car at gunpoint, victim Johnson hit the gas pedal, and drove his car through a wrought iron fence and struck a concrete barrier. Two witnesses heard a gunshot, and each observed a "skinny man" in dark clothes murmur expletives and run away. They called 911 out of concern for the driver of the car. Each witness further described in detail a car that had been following victim Johnson's car on the night of the offense that matched the description of the car owned by victim Cole. Victim Johnson's lifeless body was later recovered from the driver's seat of his car, his phone was missing, and there was $220 cash strewn about the center console. A few hours later, at 2:10 a.m. on February 24, law enforcement received a 911 call regarding a second homicide. Upon arrival to the second crime scene, the body of victim Cole was found in her car with a fatal gunshot wound to her head. Investigation later established that the Defendant killed victim Cole to ensure she would not cooperate with police concerning the murder of victim Johnson. The Defendant was interviewed by police shortly after the killings and denied involvement in the offenses, claiming to have been with his girlfriend, Mykia Crutcher, at their 733 Glenview Drive apartment for the entirety of that night. The following proof establishing the State's case, as theorized above, was adduced at the Defendant's trial, which spanned from June 19 through 22, 2018.

Demetria Todd had been in a romantic relationship with victim Johnson at the time of his death, and they shared four children together. She was unaware victim Johnson had been involved with any other women. On February 23, 2014, the day before victim Johnson's birthday, Todd and victim Johnson went to the hospital to visit their daughter, who had cancer. At that time, Todd and Johnson rented a Volkswagen, because their car had broken down. Todd specifically recalled that victim Johnson had over $200 cash that night. She also testified that victim Johnson carried a cell phone with him and that she spoke with him by phone that night. The last time Todd saw victim Johnson was about two hours before discovering he had been killed. Todd confirmed that victim Johnson sold drugs to support their family. She also provided victim Johnson's phone number and a description of his phone to the police. Finally, she identified a photograph of victim Johnson, which was entered into evidence. A medical examiner determined that victim Johnson's cause of death was a gunshot wound, and his manner of death was homicide. The gunshot wound entered the left side of his chest near his armpit with no exit wound, and a projectile or bullet was recovered from his body.

- 2 -

Kimitha Perry, victim Cole's mother, spoke with her daughter regularly by phone and provided her daughter's phone number ending in 1255 to the police. Although Perry had never met Mykia Crutcher, the Defendant's girlfriend, Perry had heard her daughter mention Crutcher's name. Perry testified that her daughter enjoyed children, would often babysit for others, and had previously done so for Crutcher. The last time Perry spoke with her daughter was on the night of the offense, and Perry said her daughter was with Crutcher. Perry acknowledged having an older cousin who lived near Chesapeake Circle, the area where her daughter was killed, but she said there was no reason for her daughter to have been there that night. Perry also knew the Defendant's family, but she had not seen the Defendant since he was a small child. She identified a photograph of her daughter at trial, who was nineteen years old at the time of her death. A medical examiner determined that victim Cole's cause of death was multiple gunshot wounds, and the manner of death was homicide. Five gunshot wound paths were found on her body one of which entered the right side of her head. There were no defensive wounds found on her body.

Terrineka Young, established as a hostile witness by the State, was in custody for contempt of court for failing to appear initially at the Defendant's trial. Prior to the offenses, Young did not know anyone involved except D'ereka "Poo" Conway and Conway's minor, teenage sister. Conway was friends with victim Cole and Mykia Crutcher, the Defendant's girlfriend and mother of his child. Young explained that on the day of the offense, while she was with Conway and Crutcher, victim Cole found out that victim Johnson had been romantically involved with Conway's minor, teenage sister. Young testified that victim Cole and Conway's teenage sister almost fought over victim Johnson earlier on the day of the offenses; however, Conway intervened. Sometime later that day while driving Crutcher and Young around in her car, a "very bright" blue PT cruiser, victim Cole called victim Johnson and confronted him about the situation by phone. Young overheard victim Johnson "laughing" in response, which so angered victim Cole that she wanted revenge. Young testified that after the call, victim Cole said that she wanted to "set up" victim Johnson. Young explained that "set up" meant "to get [victim Johnson] robbed."

Young later went to an apartment located at 733 Glenview Drive with victim Cole and Conway, but Conway did not go inside. The Defendant, a man named "Ced," Crutcher, and the Defendant's child were already inside the apartment when they arrived. Victim Cole went into a room with the Defendant, who Young described as "small skinny-wise," and another man, who Young described as "big." Young could not hear the conversation, but the big man eventually came out of the room and told Young to leave. As Young was leaving the apartment, victim Cole, the Defendant, and the big man were also leaving. At this point, Young heard victim Cole say, "Don't shoot me" to the Defendant, to which the Defendant replied, "I'm not gonna shoot you." Young testified

that she did not believe that anyone would "actually" be killed. Young saw victim Cole, the Defendant, and the big man exit the apartment and walk toward the parking lot. She did not see them get into any cars because she walked in a different direction.

Young heard about the offenses the next morning and later provided a statement to Detective Paul Harris of the Metropolitan Nashville Police Department (MNPD). During the interview, Young identified two photographs. The photographs were subsequently admitted into evidence upon Detective Harris attesting to his handwriting on the photos noting how Young identified each individual. In the first photograph, Young identified the Defendant as the individual who said, "I won't shoot you," after victim Cole said, "Don't shoot me." She also identified him as the individual she knew to be the father of Crutcher's child. In the second photograph, Young identified the "big man" who told her she had to leave the apartment. Young stated that this individual, later determined to be Shawn Carr, "messes with" victim Cole. Young confirmed that she had multiple convictions out of several counties. She also identified the Defendant at trial as the individual known to her by the nickname "Turbo."

Two witnesses testified to hearing a gunshot at the first crime scene on the night of the offenses. Kathleen Donan heard a car pull up on her street and looked out her window. She recognized the small, black car from being parked on her street before. She said the black car pulled up and parked for a few minutes, as if it were "waiting for someone." Donan saw a dark shadow of an individual with a slender and tall physique standing against a tree, but she could not see his face. As she laid back down, she heard someone say, "punk ass mother f-----," then a gunshot. The black car pulled off immediately after she heard the gunshot, and she called 911. Donan observed the black car go down the street and crash into the fence, with the "lime or light green" PT cruiser following behind it. The PT cruiser eventually turned left after the black car crashed. Although she could not be certain, Donan believed a man may have been driving the PT cruiser and that "the skinny guy" may have gotten into the PT cruiser. Donan had seen a woman driving the same PT cruiser previously, but she did not believe this woman was driving her car that night. Donan did not tell this information to the police on the night of the offense because she was having a panic attack at the time of her statement. On cross-examination, Donan testified that she had seen the black car on her street twice and that the driver had an aunt who lived across the street. Yolanda Hambrick also heard a gunshot, looked out her window, and saw "a guy running down the sidewalk across the street from [her] house with all black on, a black hoody[.]" Hambrick described the individual she saw running away as "tall and very slim[.]"

In response to a "crash with injuries" call, MNPD Officer Matthew Cammarn responded to the first crime scene on the night of the offenses around "10:15 to 10:45-ish." Upon arrival, Officer Cammarn observed a car "resting in the Salvation Army

parking lot." The car had a significant amount of damage and appeared to have "crashed through a wrought iron fence, striking another vehicle[,] and plowing through a concrete wall[.]" The driver was unconscious, and Officer Cammarn did not move him. While waiting for the paramedics, Officer Cammarn observed cash in the center console of the car and broken glass everywhere. When paramedics found a bullet hole in the driver's back, the focus of the investigation changed from a fatal crash to a potential homicide. Because Officer Cammarn did not receive information from any witnesses at the scene of the crash, he drove down Joseph Street to investigate where the black car came from, and he observed "shattered glass on the roadway along with a bullet casing and a bullet projectile on the sidewalk." He said he found the glass and the shell casing about 500 to 800 feet from the crash. MNPD Officer Michael Agee met Officer Cammarn at the crime scene and was shown the shell casing, which was found around the 700 block of Joseph Avenue. Officer Agee collected the cash from the center console of the car before it was towed because the tow truck driver was concerned it would fly out of the damaged car window. Officer Agee also noted the names of everyone who entered the crime scene, and he did not believe any media was present at the scene. Officer Agee participated in determining the identity of the victim, who was confirmed to be victim Johnson. The parties stipulated to the admissibility of two diagrams with measurements from this crime scene and that several unspecified items of evidence in relation to the instant case were submitted through a proper chain of custody to the MNPD property room.

Douglas Belcher, an officer in the Crime Scene Investigation ("CSI") Unit of the MNPD, also responded to the first crime scene. Based on the location of the bullet fragment and tempered glass found in the road, he was able to discern the path of victim Johnson's car, which began on Joseph Avenue and ended in the Salvation Army parking lot. Officer Belcher identified a series of photographs from the crime scene on Joseph Avenue and Dickerson Pike, which were entered into evidence. The photographs from Joseph Avenue showed the location of the cartridge casing, the broken glass, and the plastic cup, which were close to each other, but further away from the bullet casing. Officer Belcher also identified a series of photographs showing the location of victim Johnson's car crashing through the fence and into the wall at the Salvation Army. Photographs of the inside and the outside of victim Johnson's car showing the driver's side window "broken out" were also admitted into evidence. No bullet strike marks were found on victim Johnson's car, which was confirmed as a Volkswagen Jetta. The photographs showed blood on the ground outside the driver's side of victim Johnson's car as well as on the driver's seat and door. The photographs also showed the following items: cash in the center console, more broken glass, several CDs, and a lollipop sitting on the ledge of the rear driver's side window. Officer Belcher received $222 cash from the center console of the car from Officer Agee, and he identified the same at trial.

Officer Matthew Filter also responded to the first crime scene, interviewed victim Johnson's relatives, and obtained victim Johnson's phone number from his cousin. Officer Filter obtained video surveillance from a nearby convenience store and provided it to Detective Hafley, the lead investigator. David Kline, the Manager of the Mapping Division at the Metropolitan Planning Department, created several maps with multiple perspectives of 631 Dickerson Pike and 717 Joseph Avenue, which were also entered into evidence.

Officer Craig Amabile of the MNPD responded to a "shots fired" call near 3303 Chesapeake Drive, the second crime scene, around 2:00 a.m. on February 24, 2014. Upon arrival, he observed a "blue-ish. . . teal-colored PT Cruiser that had its doors open." The driver's side window had been busted out and the driver was slumped over to the right with multiple gunshot wounds. Shell casings were on the front passenger's side seat and the back floorboard and four additional shell casings were found outside of the passenger's side of the cruiser. The driver had a hole in her torso and an object that was "bulging" out of her right temple. Officer Amabile's partner checked for signs of life on the victim, while he checked a debit card found in the back floorboard which determined the driver to be victim Cole. He did not observe a cell phone in the cruiser. Neighbors in the area reported "hearing between two to four gunshots" and were unfamiliar with the victim's cruiser, which was parked in the driveway between the duplexes. Officer Amabile secured the crime scene, but he was unsure who was the first officer to arrive. He testified that the front doors of the cruiser were open when he arrived, and that another officer could have opened the front driver's side door to check the victim. The parties stipulated to the accuracy of a diagram of the second crime scene and the evidence collected from that location.

Investigator Kenneth Wolfe also responded to the second crime scene. He observed several cartridge casings inside and outside the cruiser, as well as multiple bullet fragments on the victim, who was not moved prior to the arrival of emergency responders. There were six cartridge casings collected from the scene, which were admitted into evidence. He identified several photographs taken at the crime scene, which were entered into evidence. Investigator Wolfe testified that most firearms eject cartridge casings to the right and that "all of the evidence of the actual shooting from a gun" was found on the passenger's side of the cruiser. He did not find a weapon, a cell phone, or any information to identify the victim at the crime scene. On cross-examination, Investigator Wolfe agreed that the victim's PT cruiser appeared "baby blue" in photographs, but it was actually an "odder teal" color. He also clarified that he did not actually collect any of the evidence from the crime scene, and he could not testify as to whether the victim's body had been moved before he arrived.

Lisa Whitaker testified that she was employed as a crime scene investigator for the MNPD Crime Lab in February 2014. She processed victim Cole's cruiser for evidence and latent fingerprints, all of which was forwarded for further examination and analysis. She also took photographs of the cruiser, which were admitted into evidence. The only damage that she noted was that the "front driver window was shattered." Inside the cruiser there was shattered glass in the front driver's seat, floorboard, the center console, the back driver's side floorboard; a child's car seat in the back of the car; a debit card and cash; and an invitation for a child's birthday party. The State introduced the debit card and the invitation, which appeared to have blood on them, as well as the cash, into evidence. She did not find any drugs, weapons, or a cell phone in victim Cole's cruiser.

At the time of trial, Marcus Banes was in custody for several crimes, including "attempted homicide," aggravated robbery, attempted especially aggravated robbery, and second-degree murder. He had received a sentence of fifteen years for the first three charges and was awaiting sentencing on the second-degree murder. An addendum to his plea agreement was admitted into evidence, which stated that if he provided truthful testimony in the instant case, he would receive a sentence of no less than thirty years imprisonment. Banes acknowledged that he faced an aggregate sentence of fifty years but for his cooperation in the instant investigation.

In 2013, Banes met the Defendant, widely known by the nickname Turbo, through a friend at a group home, where Banes came to know the Defendant "like [the] back side of [his] hand." In January 2014, while Banes was in custody, he called the Defendant on his phone, and the Defendant "put money on his books." Banes testified that he was still in custody on the offense dates, February 23 and 24, 2014. The day before the offenses, Banes spoke to the Defendant on the phone, and the Defendant told Banes he had a "big one" or a "big lick," which meant a robbery. A week or so later, the Defendant visited Banes while he was in jail and told him "that the lick he was talking about was dealing with [victim Johnson], he had robbed [victim Johnson] and shot him and had to eliminate [victim Cole] because she could have been a witness if he was to get . . . charged in the murder." Banes testified that "[the Defendant] said that [victim Johnson] had pulled off and he had shot [victim Johnson][,]" and that "[the Defendant] had lured [victim Cole] into coming to pick him up . . . and I guess he shot her in the head, he said he shot her[.]" The Defendant mentioned Shawn Carr and "laugh[ed] about" the fact that Carr was "shaken[;]" however, Banes did not have details regarding Carr's involvement. The Defendant also told Banes that victim Cole had set up the robbery of victim Johnson. The Defendant told Banes that victim Johnson "pushed the gas" as the Defendant approached him, and the Defendant shot victim Johnson "through the car[.]" Banes said the Defendant did not tell him whether he took any money from victim Johnson or why he shot victim Johnson.

- 7 -

The Defendant told Banes that the PT cruiser involved was victim Cole's car. The Defendant said that he shot victim Cole in the head while she was sitting in the driver's seat of her PT cruiser and that the Defendant was in the passenger seat. The Defendant "lured" victim Cole to the Westchester area, which was near Chesapeake and Parkwood. Banes demonstrated for the jury how the Defendant told him that he killed victim Cole. He believed the Defendant was leaning out of the passenger's seat and used his right hand to pull the trigger. Banes could not recall whether the Defendant told him how many times he shot victim Cole, but the Defendant told Banes that she was dead when he left the crime scene. Banes testified that he did not see any news coverage concerning the offenses while he was incarcerated. Banes said that the Defendant changed his phone number the day of or the day after the offenses.

On cross-examination, Banes said he went to the police because he "felt it was right" and he was changing his life. He acknowledged that he was initially facing a life sentence for first degree murder before he spoke to the police and that he eventually entered a guilty plea to second degree murder. Defense counsel pressed him on the terms of his plea agreement, which Banes conceded. Banes reiterated that he did not see anything on television about the offense and found out about them because "[e]veryone talked about [it] in the jail." Banes testified that he did not know initially who the Defendant was talking about when he said he had a "big lick." Banes believed that he met with the police three times. The parties stipulated that Wayne Miller was the custodian of records for the Davidson County Sheriff's Office, and he completed a visitation report for Banes. The visitation report included potential dates the Defendant was on a visitor list for Marcus Banes from February 19, 2014 through August 20, 2014.

Finally, Banes testified that he followed the Defendant on Twitter and that the Defendant's Twitter handle was "TurboGuwop." He said that "Guwop" stands for "Getting money, having money." Banes became aware that the Defendant changed his Twitter handle to "Wayne Perry," which was one of the Defendant's nicknames. Banes never spoke to the Defendant about his Twitter account or his posts.

MNPD Detective Curtis Hafley, the lead detective in victim Johnson's homicide investigation, responded to the first crime scene at Joseph Avenue on the night of the offense. The next morning, Detective Hafley was advised by a supervisor that there was another homicide "up on Chesapeake Avenue involving [victim Cole]," which had similarities to the Johnson homicide which included: 40-caliber cartridge casings found at both crime scenes, the involvement of the blue PT cruiser in both crimes, and the connection between victim Cole and victim Johnson. Detective Hafley confirmed that he received conflicting reports about the color of the PT cruiser.

Detective Hafley attended victim Johnson's autopsy, and he collected evidence from the medical examiner's office, including the bullet recovered from his body which was identified and admitted as an exhibit at trial. Fingerprint and DNA analysis of the plastic cup and the lollipop stick collected at victim Johnson's crime scene, and of victim Johnson's car and his pants were performed; however, none were of value to the investigation. Through victim Cole's investigation, Detective Hafley learned that "probably a half a dozen people [] were in and out of [victim Cole's] car [on February 23, 2014][,]" including Crutcher and the Conway sisters. He also learned that the Defendant had been in victim Cole's car within the last week. Detective Hafley investigated potential suspects other than the Defendant based on information he received at victim Johnson's crime scene and from Detective Fuqua, but these leads did not pan out. Detective Hafley also participated in the interviews of the Defendant and several other witnesses.

When Detective Hafley interviewed the Defendant, the Defendant acknowledged that he had seen victim Cole on February 23, 2014, at the 733 Glenview Drive apartment. However, the Defendant claimed that he had gone to the Dollar Store with Crutcher early that day and spent the rest of the night at the Glenview apartment. Detective Hafley was unable to confirm this information. The Defendant provided Detective Hafley with Crutcher's phone number ending in 5038, which the Defendant claimed they shared. However, Detective Hafley determined through jail call records that the 5038 number was affiliated solely with the Defendant. Multiple calls were made to this number on and prior to February 23, 2014; specifically, a call made from Quintel Hudson to the Defendant to the 5038 number on the night of the offense. He also identified calls made from Hudson to the Defendant at the number ending in 2963 on February 27 and March 2, 2014. Lastly, Detective Hafley identified a jail call made from Banes to the Defendant at a number ending in 6855 on February 26, 2014. Detective Hafley determined that a phone number ending in 6064 belonged to Conway's teenage sister.

Detective Hafley testified that he received information early on the morning of the offense, that "a guy named Turbo was responsible for" the offenses. Through his investigation, Detective Hafley learned that victim Cole and Crutcher were friends, which led to information that Crutcher and the Defendant were staying at an apartment at 733 Glenview Drive. He also learned that victim Cole had spent the night there and "was possibly in a dating relationship with [] [Shawn] Carr." Detective Hafley's investigation further revealed that victims Johnson and Cole were in a relationship. Because the cell phones of victims Johnson and Cole were not recovered from either crime scene, Detective Hafley began to focus on obtaining cell phone records and data. He also determined that victim Cole's purse was never recovered from the crime scene. Finally, Detective Hafley identified two surveillance videos collected from convenience stores located on Dickerson Pike that corroborated the testimony of the 911 callers. The videos

were admitted into evidence and played for the jury. The first video showed a "blue PT Cruiser that went northbound on Dickerson Pike[.]" The second video from "the south side of the BP at 701 Dickerson Pike" showed victim Johnson's car as it traveled down Joseph Avenue and ultimately through the Salvation Army parking lot. The second video also captured a PT cruiser following victim Johnson's car, which turned right "about the time of the shooting."

On February 27, 2014, Detective Hafley executed a search warrant at the Glenview apartment and Shawn Carr, Takoria Primm, and Zedric Corbin were present. Takoria Primm, the named resident of the Glenview apartment, had been romantically involved with Shawn Carr. Detective Adam Weeks of the MNPD homicide unit recovered several items of value during the search including a Huawei cell phone, a wallet with a photo of victim Cole, and a High Point .40 caliber pistol, all of which belonged to Shawn Carr. Upon analysis, the Huawei phone contained information which led detectives to the Defendant's cell phone number. Detective Hafley also conducted preliminary examinations of cell tower data on this phone and the called numbers, which revealed that "both of the victims were at the scene of their crimes and that [the Defendant's] phone was near the scene of each crime close to the time of when those crime[s] happened."

Detective Hafley interviewed Shawn Carr on February 26, 2014, but he was unable to "corroborate anything" to place him near either crime scene. The call detail report from his phone did not lead to information that Carr's device was anywhere near either crime scene. Additionally, the description from a witness at the Johnson crime scene matched the Defendant and not Carr. The Defendant's address was in the Chesapeake area, which was near the Cole crime scene, and the Defendant also had a friend that lived in that area. The State introduced a letter addressed to the Defendant in jail from Julius Lanier with a return address on Chesapeake Circle. Using maps and photographs that were previously admitted into evidence, Detective Hafley showed where this address was located in relation to the Cole crime scene.

On September 2, 2015, Detective Hafley interviewed Marcus Banes. At this point in the investigation, a warrant had been issued for the Defendant, but he had not been arrested. Detective Hafley stated that Banes knew the following information that had not been publicly available: that victim Johnson was shot in the car and sped away after he was shot and that victim Cole had been shot in the head. Detective Hafley also testified that Banes's in court demonstration of how the Defendant shot victim Cole was consistent with the investigation. Finally, Detective Hafley identified a phone call made from Banes to the Defendant on February 21, 2014, at 3:04 p.m., which was admitted into evidence and played for the jury. In this call, the Defendant tells Banes, "I think I done came across a big one." Detective Hafley also identified visitation records for the

Davidson County Sheriff's Office, which confirmed that the Defendant visited Banes on February 26, 2014. Detective Hafley stated that it did not appear that any money had been taken from victim Johnson's car after the offense.

Detective Hafley identified screen shots from a Twitter account which showed several photographs of the Defendant. These photographs were of a small child and also showed the Defendant holding money and guns. The main page of the account contained a description which said, "Follow my wife @ MykiaCrutcher." The name on this account was TurboGuwop@dumbway107. Detective Hafley acknowledged that the Defendant's Twitter handle changed to "TurboWaynePerry!@dumbway107" and "Jay100gang@dumbway107," but these were each a continuation of the same account. The account also listed the phone number ending in 5038 and referenced known affiliates of the Defendant, including Julius Lanier. The State introduced copies of the Defendant's Twitter feed into evidence, which read as follows:

> February 6, 2014: @JUsMI_tj call me xxx-5038.
>
> Show me what you're up to on Glide video texting. Add me from chat.glide.me/jtbbjon.
>
> April 1, 2014: Smoking on dat Pee-Wee, PACC, dat boy had a fat head. I'm laying n---as flat dead #hahaha!
>
> April 6, 2014: Murder rate gonna be sky high in 2014 & dey say Ima play a big part in it.
>
> July 11, 2014: Woke up, felt like doing a hit [three pistol emojis], dis shit up in me.

Detective Hafley stated that the Defendant's Twitter account was "open and viewable to the public" and had "over 3,000 posts[.]"

On cross-examination, Detective Hafley acknowledged that "dey" referenced in the Defendant's April 6, 2014 tweet could have been about anyone and that head and dead from the Defendant's April 1, 2014 tweet rhymed. Detective Hafley reiterated that the details about victim Johnson being shot through the car, victim Cole being shot in the head, and where the shooter was when victim Cole was killed, were not released to the media. He acknowledged however that "[w]henever there's a murder, there's usually media[,]" and he identified a media release from the MNPD on February 24, 2014. He

stated that the press department would generally talk to a detective on the case before putting out a media release.

Detective Hafley confirmed that he interviewed Banes nineteen months after the offenses in this case. He did not know what information Banes had access to inside the jail, other than a telephone, and he acknowledged that inmates in the jail were talking about the offenses in this case. Detective Hafley requested fingerprint comparison for "everybody's prints that [they] had," including Carr. He then stated that the prints on Cole's car were specifically compared to the prints of Cole, Johnson, Corbin, and the Defendant, and the Defendant's prints did not match. The plastic cup and the lollipop stick on victim Johnson's car were tested for DNA, but they did not match the Defendant's DNA. Carr's DNA was not specifically compared to these items, and his fingerprints were not specifically compared to the prints found on victim Cole's car.

Detective Hafley confirmed that Banes spoke to the Defendant on the phone on February 26, 2014, which was two days after the press release. The visitation report showed that Banes had rejected the Defendant as a visitor previously. However, Detective Hafley explained that at this point the Defendant had been interviewed and knew he was being investigated when he spoke to Banes on February 26. Detective Hafley reiterated that he had no evidence that Carr was involved in either of the murders. Asked if he spoke with Jamie Pirtle, Carr's cousin, during the investigation, Hafley confirmed that Detective Harris interviewed Pirtle in August 2014, and Detective Hafley conducted a second interview in October 2015. Asked if he received "some information from Jamie Pirtle that would have linked Shawn Carr to this murder," Detective Hafley replied, "Yes, sir, he talked about him." Pressed further about the information received from Jamie Pirtle, Detective Hafley explained that it could not be independently corroborated in the same way as the information provided by Marcus Banes. Detective Hafley stated that he was not aware of the details of Banes's agreement with the State until Banes testified about it at trial.

On redirect examination, Detective Hafley stated that latent fingerprint testing was initially requested for a "wide range of people[,]" including Carr. Detective Hafley confirmed that the press release did not provide that victim Johnson was shot while he was in the car or that there was a robbery or an attempted robbery, although Banes knew these details. The press release also did not state where victim Cole was seated when she was shot, that the shooter was seated in the passenger's seat, that the shooter pulled out of the car as he was shooting, or that victim Cole was shot in the head. The press release was entered into evidence. On recross-examination, Detective Hafley stated that he was not sure if "major case prints" were taken from Carr, but they were taken from the Defendant when he was arrested.

Officer James Fuqua, the lead detective in victim Cole's homicide, responded to the second crime scene and was briefed by the responding officers. He testified that the passenger door of victim Cole's car was open upon his arrival and that efforts to resuscitate victim Cole had failed. Detective Fuqua observed blood around her body, shell casings in the front and back floorboards, and the driver's side window was broken out. He further confirmed that the engine was running when responding officers arrived, the officers turned off the car, and that they opened both the driver's side front and back door of victim Cole's car. Family members of victim Cole spoke to him about victim Johnson's homicide earlier in the evening. He spoke to Detective Hafley the next day, who advised him that a car matching the description of victim Cole's PT cruiser was seen at victim Johnson's crime scene. Officer Fuqua also participated in the interview of the Defendant and confirmed that the Defendant said that he had been in victim Cole's PT cruiser "a day or two" prior to the offense. A redacted version of the Defendant's statement was played for the jury and admitted into evidence.

Officer Fuqua also attended victim Cole's autopsy, from which he collected five bullets from her body and DNA evidence. He identified the bullets at trial and confirmed that he requested the Tennessee Bureau of Investigation ("TBI") to compare the cartridge casings and bullets from the Cole crime scene to those from the Johnson crime scene. Officer Fuqua also assisted in executing the search warrant at 733 Glenview Drive apartment and confirmed, among other things, that Shawn Carr lived at the apartment. Finally, Officer Fuqua obtained cell phone call detail records for cell phone numbers ending in 5038, 9327, and 1277, which were entered into evidence.

Special Agent Steve Scott, previously employed with the TBI in the Firearms Identification Unit of the Crime Lab, examined four fired bullets removed from victim Cole's body; one cartridge casing from the Johnson crime scene at Joseph Avenue; one bullet recovered from victim Johnson's right chest; and a firearm recovered from 733 Glenview Drive. He compared the bullet and cartridge case that was recovered from the Johnson homicide to six cartridge cases and four bullets that were recovered from the Cole homicide. Agent Scott concluded that the bullets and cartridge casings from the different crimes were not fired from the same weapon. The bullets from both cases had "six right twist rifling," which was consistent with Glock pistols. He was able to conclude that all six of the cartridge cases recovered from the Cole crime scene were fired from one firearm, but he stated that the cartridge case from the Johnson crime scene had different marks. The .40 caliber firearm recovered from 733 Glenview Avenue apartment was compared to the cartridge casings and the bullets recovered from the Johnson and Cole cases, and "none of those bullets or cartridge cases were fired by [that] firearm." Agent Scott's report reflecting his conclusions was admitted into evidence at trial. Agent Scott described the characteristics of a Glock pistol and viewed a photograph of an individual, later identified as the Defendant, holding a firearm. Agent Scott opined

that the gun being held by the Defendant in the photograph "appear[ed] to be a Glock pistol." He stated that he did not know if this was the murder weapon, and he "did not examine a gun that identified to any of the bullets or cartridge cases."

Detective Chad Gish of the MNPD's Surveillance and Investigative Support Unit, testified as an expert in telephone and computer forensics. Detective Gish assigned another detective to perform an extraction of Carr's Huawei phone and generate a report, which Detective Gish reviewed. Detective Gish stated that there was an error in generating the report, which meant that an hour would need to be subtracted from any times in February. However, his testimony would include the proper date and time for the phone calls. The State introduced a disc containing the full extraction report as well as excerpts from Carr's Huawei phone, both of which were entered into evidence.

Detective Gish found contacts for victim Cole, Crutcher, and two numbers for the Defendant, who was listed as Turbo in Carr's phone. The Defendant's active number ended in 2963 and another number ending in 5038 associated with the Defendant had been deleted. Two additional contacts listed the Defendant as "Turbo Bite" and "D Turbo Homey[.]" Carr received a text message from the 5038 number on January 31, 2014, which stated, "Call Woods and tell them you're Michael Wright, and tell them fax a copy of my check stub[.]" Carr's phone also revealed communication with victim Cole's number based on a phone call made to victim Cole on February 24, 2014, at 5:29 a.m., and a text message to victim Cole at 5:32 a.m. stating, "Call me, from Shawn, ASAP[.]" Detective Gish determined that there were several phone calls between Carr, the Defendant, and Crutcher on February 24, 2014. On February 26, 2014, Carr received an incoming call from "Turbo" as well as a text message which said, "Dis Turbo, my new number cuz[,]" from a number ending in 2963. Detective Gish was able to determine that the Defendant changed his phone number sometime between February 24 and February 26, 2014. He did not find any evidence that the Defendant's 5038 phone had contacted Carr's phone after February 24, 2014 at 2:10 a.m. Detective Gish acknowledged that phone "batteries go bad[,]" and that on February 20, 2014, the Defendant texted Carr, saying "I'm broke, I ain't even took the battery back."

Detective Chadwick High of the MNPD's Surveillance and Investigative Support Unit testified as an expert in call detail record analysis. He completed call detail reports on phone numbers for victim Johnson, victim Cole, and the Defendant's numbers, all of which were admitted into evidence. A PowerPoint presentation explaining his role and his findings in this case was also introduced into evidence. Detective High plotted Chesapeake Circle and the intersection of Grace Street and Joseph Avenue on a map which showed close-up views of the nearest cell phone towers to these locations. Detective High's reports also detailed the call usage and patterns in between the three phone numbers in this case on February 23, 2014, between 9:30 and 10:45 p.m. Based on

his report, victim Johnson had voice and text contact with victim Cole, as well as other unspecified numbers. Victim Johnson's phone also communicated with the teenage Conway sister's device several times during this period. Victim Cole's device called victim Johnson's device eleven times and received calls from victim Johnson's device three times. Victim Cole's device called the Defendant's device nine times and received calls from the Defendant's device five times. The Defendant's phone activity showed his device "in constant communication" with victim Cole before victim Johnson's 911 call is received at 10:32 p.m. The Defendant's device called victim Cole's device eighteen times, his device received calls from victim Cole's device eight times, and he had an incoming text from her device one time. The Defendant's phone activity on February 23 ceased ten minutes before victim Johnson's 911 call was received, or at 10:22 p.m., and there is no further activity between the Defendant's and victim Cole's devices.

After victim Johnson's 911 call was received, the Defendant's device began communicating with numerous other numbers including sixteen events with an unknown number ending in 6647, seventeen events with a number ending in 5654, purportedly his mother, and three calls to Shawn Carr's phone number. The Defendant's device communicated with Mykia Crutcher's phone throughout the night. The last communication for the Defendant's device occurred 22 minutes prior to the incoming 911 call for victim Cole's homicide. Detective High also completed location analysis reports on the phone numbers, which showed that the handset of Defendant's, victim Cole's, and victim Johnson's devices were all communicating with cell towers in the area of the crime scene from 10:09 p.m. to 10:33 p.m. on February 23, 2014. From 12:02 a.m. to 1:25 a.m. on February 24, the Defendant's device is communicating with a cell tower which covered the area of Chesapeake Circle, the victim Cole crime scene. Twenty-two minutes later, a 911 call concerning victim Cole was received at 2:10 a.m. No further events or tower activity occurred for the Defendant's device.

On cross-examination, Detective High testified that the Glenview Drive apartment was within the two mile cell tower "overlap" for the victim Johnson crime scene, which meant that the Defendant's device could have been at either location at the time of the offense. He also reiterated that he could not tell who had been using these devices. Detective Cole said he did not know whether a subpoena was issued for the unknown phone numbers on the records, but he agreed that this could have been done.

The Defendant did not offer any proof. Following deliberations, the jury convicted the Defendant as charged in count one, the first-degree felony murder of victim Johnson, and count three, the first-degree premeditated murder of victim Cole. The Defendant was convicted of voluntary manslaughter in count two, which was subsequently merged into count one.

On September 7, 2018, the trial court conducted a sentencing hearing. The State introduced the following items into evidence: the Defendant's presentence report, certified judgments showing that the Defendant was on probation at the time of these offenses, and records showing entry and exit dates of the Defendant into the Kentucky Department of Corrections and into the custody of the Davidson County Sheriff's Office (DCSO). Following the convictions in this case, Detective Hafley pulled recorded jail calls made by the Defendant. In one call, the Defendant spoke with Quintel Hudson and Trevor Anderson about "what needed to happen to Mr. Banes for his testimony." The call was admitted into evidence and played for the court. On cross-examination, Detective Hafley agreed that the Defendant never "requested anything be done to [] Banes" in any phone calls made by the Defendant. The State introduced victim impact statements from family members of victims Johnson and Cole.

In sentencing the Defendant, the trial court reasoned as follows:

In this case [the Defendant] was convicted in Count One of felony murder, Count Two Voluntary Manslaughter, and Count Three of Murder in the First Degree. Counts One and Two merge to Felony Murder for which he receives a life sentence. And Count Three is First Degree Murder which is, also, a life sentence.

The Court has looked at the enhancement factors pursuant to T.C.A. 40-35-114 and believes the following enhancement factors apply: First, he has a prior criminal record; secondly, this crime involved more than one victim; third, he has failed to comply with conditions of release while in the community; and, fourth, this felony resulted in the death of not only one person but two individuals.

The Court, also, has looked at 40-35-115 and believes that three factors apply: First and foremost, he does, in fact, have an extensive criminal record; secondly the [D]efendant is sentenced for -- had been sentenced for an offense committed while on probation. And, finally, the Court believes that the [D]efendant is a dangerous offender whose behavior indicates little or no regard for human life.

As such the Court believes that a consecutive sentence is appropriate in this case; and, further, it is necessary to protect the public against further criminal conduct by the [D]efendant, and a consecutive sentence reasonably relates to the seriousness of the offenses committed.

As such, he will receive consecutive sentences of life.

- 16 -

On January 9, 2019, the trial court conducted a hearing on the Defendant's motion for new trial and amended motions for new trial, which were denied. The Defendant filed a timely notice of appeal, and his case is now properly before this court for our review.

## ANALYSIS

**I**. **Interstate Compact on Detainers.**[1] The Defendant insists that he complied with the Interstate Compact on Detainers (ICD) notice provisions in May 2015 when, after he made his initial request to Kentucky authorities, he received a "green receipt" purportedly from the Davidson County Clerk's Office that his request had been received. Because Tennessee failed to bring his case to trial within 180 days of his May 2015 request, he contends that the trial court erred in denying his motion to dismiss. In response, the State contends that the trial court properly found no violation of the ICD because there was no proof establishing that the Defendant's initial May 2015 request was ever received by the proper authorities. The State further argues that the Defendant failed to comply with the strict mandates of the ICD because his initial May 2015 written request for disposition of his charges was insufficient. We agree with the State.

On October 2, 2014, the District Attorney General for Davidson County approved nationwide extradition of the Defendant on two counts of first-degree murder for him to be returned to Davidson County, Tennessee. At the Defendant's June 1, 2016 arraignment on these charges, the State generally advised that the Defendant was in Tennessee custody based on his ICD request, which he "properly filed, lodged and sent" by mail to the appropriate parties. The State further said that "whoever in the office opened the letter . . . put it in the file instead of giving it to Ms. Fuller." Nevertheless, after a status inquiry by the Kentucky authorities, the Defendant was picked up and brought to Tennessee. The State acknowledged that it had complied with the ICD requirements and announced it was ready for trial unless the Defendant consented to a continuance. The Defendant agreed to a continuance. On September 21, 2016, the Defendant filed a motion to dismiss based on a violation of the ICD, alleging that on May 21, 2015, while incarcerated in Kentucky, he requested a final disposition of the charges

---

[1] The "Interstate Compact on Detainers," (ICD) is codified at Tenn. Code. Ann. §40-31-101, et seq., while the "Interstate Agreement on Detainers," (IAD), see 18 U.S.C.A APP. §2, is the federal counterpart. Although the titles of the statutes have been used interchangeably by the parties throughout the pendency of this case, the language of the statutes is virtually identical and makes no material difference to the issues raised herein.

pending in Davidson County, Tennessee, and that he was not returned to Davidson County until May 20, 2016, more than 180 days after his request.

In response to his motion, the State advised the court that the May 2015 request for disposition relied upon in the Defendant's motion to dismiss had never been received by the Davidson County District Attorney's Office. Additionally, the May 2015 request was deficient in listing the jurisdiction as "Davidson Co TN" and not detailing the prosecuting officer. The Davidson County Clerk's Office also had not received notice of the request, and it was not included in the aggravated assault or homicide files pending against the Defendant in May 18, 2015. The State further advised the court that a second request for disposition was filed by the Defendant on December 22, 2015, while the Defendant was incarcerated in a different facility in Kentucky. Based on the December 2015 request, the Defendant was transported to Tennessee on May 20, 2016, served on the outstanding arrest warrant, and arraigned on two counts of first-degree murder on June 1, 2016.

On December 14, 2016, the trial court held a hearing on the Defendant's motion to dismiss. The Defendant testified that he was incarcerated in Christian County, Kentucky in spring 2015, became aware that he had pending charges in Davidson County, Tennessee, and filed "an Interstate Agreement on Detainers." He obtained the relevant documents from Sherri Guinn, a counselor at the Christian County Jail in Hopkinsville, Kentucky. A nine-page document entitled "Agreement on Detainers" was attached to the Defendant's motion and referenced throughout the hearing. The document contained Forms I, I-A, II, III, and IV, most of which were incomplete. Form I advised the Defendant of his statutory rights under the IAD and was signed by the Defendant on May 21, 2015. Form II, the inmate's notice of place of imprisonment and request for disposition of indictments from the receiving state, showed the section for the name of the prosecuting officer of the receiving state was blank. Form III showed the Defendant's custodial status in Kentucky, that he was serving a seven-year sentence, and that the detainer on file from Tennessee was for aggravated assault. Form IV, the offer to deliver temporary custody of a defendant to the receiving state, also showed the title for the prosecuting officer was blank and the jurisdiction was for "Davidson Co, TN General Sessions." According to the Defendant, Sherry Guinn mailed the documents sometime later in May. Although the Defendant claimed to have received a "green receipt" signed by "Richard Rooker" in the mail in May 2015, the Defendant was unable to produce the receipt at the hearing. He did not know where the receipt was and had not made any efforts to track it down from the post office. When nothing happened for six months in response to the May 2015 request for disposition, the Defendant filed a second request while in custody in LaGrange, Kentucky on December 22, 2015.

- 18 -

Attached to its written response to the Defendant's motion, the State provided the affidavit of Sherri Guinn, who affirmed that the Defendant had been provided with the forms necessary to complete a petition pursuant to the ICD while he was incarcerated at the Christian County Jail. She explained that Christian County Jail's procedures and protocols included typing the petition on behalf of the prisoner, making the requisite copies needed to send the petitions, and ensuring the prisoner signs Form I acknowledging receipt of the petition. However, jail procedures and protocols place the burden of mailing the petition on the prisoner, and the return receipt would have been addressed to the Defendant. Omeka Fuller, the extradition coordinator for the Davidson County District Attorney's Office, testified that she handled all the extraditions for the office in May 2015. Although she received an IAD notice from the Defendant in December 2015, she did not receive any documentation that the Defendant had filed an IAD notice in May 2015. She also explained that the IAD notice from December 2015 was not acted upon for several months until Tennessee received a status inquiry from authorities in Kentucky. Nicholas Kiefer, the director of the state trial courts at the Davidson County Criminal Court Clerk's Office, testified that he reviewed the Defendant's file and general sessions warrant. There was no IAD located in the Defendant's file "referencing a May 21st or May 2015 interstate compact on detainers[.]" He acknowledged however that the indictment was sealed in the Defendant's case, so "there would've been no file to put these documents in[.]"

In denying the motion to dismiss, the trial court reasoned as follows:

> I mean even if he did send it on that May 2015 date, there's not been any real proof that the district attorney's office or the court has received it, other than his testimony that Mr. Richard Rooker signed for it. But there's been no proof of that and without proof, the Court is simply not going to dismiss murder charges against someone, and I haven't heard any proof that would convince me that these charges should be dismissed.

In resolving this issue, we recognize that Tennessee, along with forty-seven other states, the United States, the District of Columbia, Puerto Rico, and the United States Virgin Islands have entered into the IAD. See State v. Springer, 406 S.W.3d 526, 531-32 (Tenn. 2013); Tenn. Code Ann. § 40-31-101, art. II(c) (internal citations omitted). The IAD provides cooperative procedures for transfers of prisoners between the federal and state jurisdictions that have adopted the interstate compact. Id.; see also State v. Garmon, 972 S.W.2d 706, 710 (Tenn. Crim. App. 1998) (citing Grizzell v. Tennessee, 601 F.Supp. 230 (M.D.Tenn.1984) (noting that the provisions of the compact are statutory rights, not fundamental, constitutional, or jurisdictional)). Under the IAD, a "state," may function

as either a "sending state" or a "receiving state." Id. at 532; Tenn. Code Ann. § 40-31-101, art. II(a), (b). The sending state is the jurisdiction where the prisoner is incarcerated at the time he or she makes a request for disposition under Article III or when an appropriate official in another IAD jurisdiction requests the prisoner's transfer under Article IV. Tenn. Code Ann. § 40-31-101, art. II(b). The receiving state is the jurisdiction in which trial is to be had on a pending indictment, information, or complaint pursuant to Article III or Article IV. Tenn. Code Ann. § 40-31-101, art. II(a). The IAD is remedial in nature and must be liberally construed in favor of the prisoners whom it was intended to protect. Id. (citing Nelms v. State, 532 S.W.2d 923, 927 (Tenn.1976) (citing Commonwealth v. Fisher, 451 Pa. 102, 301 A.2d 605, 607 (1973)). Because the IAD was enacted by Congress pursuant to United States Constitution, art. I, § 10, cl. 3, it is a federal law that is subject to authoritative construction by the Supreme Court of the United States. Id. (citing Cuyler v. Adams, 449 U.S. 433, 438 (1981)).

Article III of the ICD governs this issue and mandates that an inmate be brought to trial within 180 days "after having cause to be delivered to the prosecuting officer and the appropriate court" a request for a final disposition of the charges filed against the inmate.[2] If the inmate is not tried within the 180-day period, the court where the charge is "pending shall enter an order dismissing the same with prejudice, and any detainer based thereon shall cease to be of any force or effect." Id. § 40-31-101, art. V(c). In Fex v. Michigan, 507 U.S. 43, 52 (1993), the United States Supreme Court held that the 180-day period "did not commence until the prisoner's request for final disposition of the charges against him has actually been delivered to the court and prosecuting officer of the jurisdiction that lodged the detainer against him." See also State v. Moore, 774 S.W.2d 590, 593 (Tenn. 1989); State v. Marlow Williams, No. W2005-02803-CCA-R3-CD, 2007

_____

[2] Tennessee Code Annotated section 40-31-101, Article III (a) and (b) provide:

    (a)Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, ... on the basis of which a detainer has been lodged against the prisoner, the person shall be brought to trial within one hundred eighty (180) days after having caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of the person's imprisonment and request for a final disposition to be made of the indictment, information or complaint....

    (b) The written notice and request for final disposition referred to in paragraph (a) hereof shall be given or sent by the prisoner to the warden, commissioner of corrections or other official having custody of the prisoner, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested.

WL 2781720, at *5 (Tenn. Crim. App. Sept. 25, 2007). The burden is on the State to obtain the temporary custody of the defendant and to dispose of his case within the 180 days, Nelms v. State, 532 S.W.2d 923 (Tenn.1976), and to establish that it complied with the 180-day time period. State v. Lock, 839 S.W.2d 436, 441 (Tenn. Crim. App. 1992).

The Defendant insists that he is entitled to relief based on a conflict between Nelms and Moore. We do not see these cases to be at odds. The Court in Moore explicitly distinguished Nelms and determined that it was not controlling. To be clear, Moore specifically dealt with interpreting the language of and relief under Article III of the ICD, and clearly held that the 180-day time period did not begin to run until the proper authorities of the receiving state had actually received the defendant's ICD notice. Whereas in Nelms, "it was the delay of the sending state in complying with Article V which was held not to be charged to the prisoner." Moore, 774 S.W.2d at 594. Significantly, the prisoner in Nelms complied with his Article III obligations and relief was granted based on a violation of Article V of the ICD. Id. Because the record shows that neither the Davidson County prosecutor nor the Davidson County Criminal Court clerk ever received the Defendant's first, May 2015 request for disposition under the ICD, the trial court properly denied his motion to dismiss. He is not entitled to relief.

**II.** **Motion to Sever.** This issue is multifaceted and concerns a statement provided to the Defendant in discovery made by Jamie Pirtle, who stated, in pertinent part, that Shawn Carr[3] told Pirtle that Carr had "shot a guy while trying to rob him" and that "[t]he guys girlfriend had witnessed it and Turbo [this defendant] then shot and killed the girlfriend."[4] As we understand his initial claim, defense counsel theorized that the first sentence of the statement was "an admission against interest" as to Carr and that the second sentence of the statement was inadmissible hearsay, all of which mandated severance of counts one and two (victim Johnson homicide) from count three (victim Cole homicide). Our review of this issue is complicated by the fact that neither the motion to sever nor the defense arguments at the hearing on the motion to sever cite, apply, or operationalize the rules regarding severance. See Spicer v. State, 12 S.W.3d 438, 443 (Tenn. 2000) (discussing the distinction between severance and consolidation rules and noting that characterization of the issue is of considerable importance because the legal standards by which our review is governed vary depending upon the type of case involved). In the Defendant's amended motion for new trial, the Defendant claimed for the first time that in denying the motion to sever the trial court denied his constitutional right to present a defense under State v. Brown, 29 S.W.3d 427 (Tenn.

---

[3] Shawn Carr's first name was also spelled as "Sean" Carr; however, for consistency we will continue to refer to him as Shawn Carr.

[4] The record shows that the defense was provided with a compact disc of audio interviews of Jamie Pirtle.

2000). Accordingly, we agree with the State, and conclude that the Defendant does not raise a genuine challenge to the joinder of his offenses based on the traditional requirement that evidence in one case be admissible in the other case. Rather, in arguing that the trial court erred in denying to admit the first sentence of the Pirtle statement into evidence, the Defendant essentially relies upon Rule 14(b)(2)(A) of the Tennessee Rules of Criminal Procedure, which provides for a severance of offenses "to promote a fair determination of the defendant's guilt or innocence of each offense."

Prior to the hearing on the Defendant's motion to sever, the State filed a comprehensive response, outlining the circumstances of the Pirtle statement and the contours of the Defendant's argument. The State characterized the Defendant's motion as an attempt to introduce into evidence the alleged statements of Carr, a non-party to the case. The State argued that offering Carr's alleged statement to Pirtle admitting to killing victim Johnson through the audio recorded statement of Pirtle was inadmissible hearsay pursuant to Rule 803 of the Tennessee Rules of Evidence. The State further posited that the Carr statement may be admissible as a statement against penal interest under Rule 804(b)(3), but only after the defense demonstrated that Carr was an unavailable witness pursuant to Rule 804(a). As previously stated, the Defendant did not file a written response or precisely articulate the grounds upon which he sought relief by written motion. At the June 11 and 18, 2018 hearings on the motion to sever, the trial court dismissed outright the Defendant's severance claim finding that the offenses were sufficiently "closely tied together." Asked to expound upon the Pirtle "third party statement," defense counsel explained that he had issued a subpoena for Carr, was unsure if it had been served, and noted that the admissibility of the statement would depend on whether Carr was unavailable to testify at trial. Following argument of the parties, the trial court ruminated on the Defendant's claim that the Carr statement was admissible through the recorded interview of Pirtle and stated as follows:

> Well I'm having trouble with it being hearsay altogether, as a matter of fact, because Jamie Pirtle's statement was not made under oath or anything, and just to be able to take someone's statement who said that he heard someone say that he is the one who committed the offense is stretching it about as far as it can be stretched, I mean, I would entertain having a hearing with Mr. Shawn Carr available, but without him being available, I still don't see how it's admissible, and he is not available because it's simply a hearsay statement by Jamie Pirtle, so we'll just see what happens with respect to Mr. Carr, if we can locate him or not.

At the close of the State's proof at trial, the trial court asked to revisit "the Pirtle issue,"

and defense counsel advised that he was not going to call Jamie Pirtle to testify. Shawn Carr was also not called as a witness at trial.

In review of this issue, we are mindful that in determining whether a statement is hearsay and, if so, whether it fits within one of the hearsay exceptions, a trial court may make factual findings and credibility determinations in ruling on an evidentiary motion, and "these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them." Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015) (citing State v. Gilley, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). However, "[o]nce the trial court has made its factual findings, the next questions-whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule-are questions of law subject to de novo review." Id. (citing State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); Keisling v. Keisling, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. When a declarant is unavailable as a witness, the hearsay rule does not exclude "a statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Tenn. R. Evid. 804(b)(3). "Unavailability of a witness" occurs when the declarant "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so" or "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process." Tenn. R. Evid. 804(a). Finally, a trial court's denial of a motion to sever pursuant to Rule 14(b)(2)(A) will not be reversed unless the defendant was prejudiced by the decision to try the charges together. State v. Thompson, 88 S.W.3d 611, 614 (Tenn. Crim. App. 2000) (citing State v. Wiseman, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982)).

The Tennessee Supreme Court has recognized that "[p]rinciples of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony. Flood, 219 S.W.3d at 315-16 (citing Chambers v. Mississippi, 410 U.S. 284, 294 (1973); Brown, 29 S.W.3d at 431). In Washington v. Texas, the United States Supreme Court reiterated that the right to present a defense is a fundamental element of due process:

> The right to offer the testimony of witnesses, and to compel their
> attendance, if necessary, is in plain terms the right to present a defense, the

- 23 -

right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law. 388 U.S. 14, 19 (1967).

Nevertheless, the right to present evidence and witnesses is not absolute. Brown, 29 S.W.3d at 432. An accused, in exercising this right, must comply with the established rules of procedure and evidence, which are "designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Chambers, 410 U.S. at 302. "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." Flood, 219 S.W.3d at 316.

Generally, an evidentiary ruling does not rise to the level of a constitutional violation. State v. Rice, 184 S.W.3d 646, 673 (Tenn. 2006). However, "the erroneous exclusion of evidence that thwarts a criminal defendant's right to present a defense is constitutional error." State v. Bell, 512 S.W.3d 167, 190-91 (Tenn. 2015) (citing Rice, 184 S.W.3d at 673; Brown, 29 S.W.3d at 436). In determining whether the exclusion of evidence violates a defendant's constitutional right to present a defense, this court must consider:

(1) Whether the excluded evidence is critical to the defense;

(2) Whether the evidence bears sufficient indicia of reliability; and

(3) Whether the interest supporting exclusion of the evidence is substantially important.

Flood, 219 S.W.3d at 316 (citing Brown, 29 S.W.3d at 434-35; Rice, 184 S.W.3d at 673; State v. Rogers, 188 S.W.3d 593, 614 (Tenn. 2006)).

To the extent that the Defendant maintains on appeal that the Carr statement was admissible at trial through the audio recorded statement of Pirtle, we disagree. The audio recording itself is hearsay because it contains a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of

the matter asserted." Tenn. R. Evid. 801(c). Pirtle's statement also contains the alleged confession of Carr, which adds yet another layer of hearsay. Accordingly, the Pirtle audio recorded statement is "hearsay within hearsay" and "each part of the combined statements [must] conform[] with an exception to the hearsay rule" to be admissible. Tenn. R. Evid. 805. In regard to the audio recorded Pirtle statement itself, the Defendant does not offer an exception to the hearsay rule. The Defendant asserts Carr's alleged confession that he killed victim Johnson is admissible as a statement against penal interest. Tenn. R. Evid. 804. However, the Defendant presumes that Carr would have invoked his right against self-incrimination and fails to establish that Carr was, in fact, unavailable at trial. See State v. Cureton, 38 S.W.3d 64, 79 (Tenn. Crim. App. 2000) (discussing interplay between constitutional right to present a defense and admissibility of confession by third party suspect)(citing State v. Darryl J. Bailey, No. 02C01-9506-CR-00176, 1998 WL 855464, at *5-6 (Tenn. Crim. App., Jackson, Dec. 10, 1998) (discussing proper introduction of third party admissions)). Although defense counsel said that he subpoenaed Carr, he presented no proof showing his efforts to obtain Carr's presence at trial. When the trial court inquired as to the Pirtle issue at the close of the State's proof, defense counsel remarked only that he was not calling Pirtle as a witness. Because both statements do not conform with an exception to the rule against hearsay, the Pirtle audio recorded statement was not admissible.

Additionally, upon considering the criteria specified in Flood, we conclude that the exclusion of the Pirtle statement did not violate the Defendant's due process rights. Detective Hafley noted that at the time of the statement, Pirtle was in custody and did not wish to be utilized as an informant until after he was released. Detective Hafley was cross-examined at trial concerning the information provided by Pirtle and affirmed Pirtle discussed information linking Carr to the killings. However, upon further investigation, Detective Hafley was unable to corroborate the information provided by Pirtle. Detective Hafley also investigated Carr's cell phone records, including the call detail reports and cell tower records, and he could not find any evidence establishing Carr's presence at the crime scenes on the night of the offenses. Accordingly, we conclude that the exclusion of this evidence did not violate the Defendant's due process right to present a defense. Having failed to establish prejudice by the joinder of offenses, the denial of the motion to sever was proper.

**III. Admissibility of Twitter Posts.** During trial, five screenshots of Twitter "posts" from the Defendant's Twitter account were admitted into evidence. The Twitter posts contained written language as outlined in the factual summary[5] and three

---

[5] "@JUsMI_tj call me xxx-5038"; "Show me what you're up to on Glide video texting. Add me from chat.glide.me/jtbbjon;" "Smoking on dat Pee-Wee, PACC, dat boy had a fat head. I'm laying n---as flat dead #hahaha!"; "Murder rate gonna be sky high in 2014 & dey say Ima play a big part in it."; "Woke up, felt like doing a hit [three pistol emojis], dis shit up in me."

- 25 -

photographs showing the Defendant holding (1) a long assault-type weapon; (2) two automatic-type weapons in each hand aimed at the camera; and (3) an automatic-type weapon in one hand and a bundle of cash in the other. On appeal, the Defendant challenges the admissibility of "extensive social media post[s]" and the photographs showing him holding weapons at trial, which he argues violated Rule 404(b) of the Tennessee Rules of Evidence. The Defendant insists (1) there was "insufficient linkage" between the Twitter account, the Defendant, and when the content was placed on the account; and (2) the photographs showing him holding weapons were not linked to the offenses in this case. In response, the State contends the trial court properly admitted the Defendant's Twitter posts after they were sufficiently authenticated at a pre-trial hearing. The State argues further that the Twitter posts were admissible to prove the Defendant's identity as the perpetrator of the offenses and as statements of a party opponent under Rule 803 of the Tennessee Rules of Evidence. Finally, the State points out any challenge to specific dates of the Twitter posts "goes to the weight of the evidence, not its admissibility." See State v. Jabriel Linzy, No. E2016-01052-CCA-R3-CD, 2017 WL 3575871, at *12 (Tenn. Crim. App. Aug. 18, 2017).

This court reviews decisions regarding the admissibility or exclusion of evidence by the trial court for an abuse of discretion. State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008) (citing State v. Scott, 33 S.W.3d 746, 752 (Tenn. 2000); State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987)). Accordingly, we will not reverse unless the "'court applied an incorrect legal standard or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)). Rule 901(a) of the Tennessee Rules of Evidence provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Evidence may be authenticated through "[t]estimony that a matter is what it is claimed to be" or "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Tenn. R. Evid. 901(b)(1), (4). Finally, determining whether social media evidence has been authenticated requires fact specific analysis, which can be based upon corroborating circumstantial evidence. Jabriel Linzy, 2017 WL 3575871, at *12.

Prior to trial, the Defendant filed a motion in limine challenging the introduction of "any statements, documents, pictures, or other communication" contained on the Defendant's Twitter account. During a jury-out hearing, Detective Hafley testified extensively concerning his investigation of the Defendant's Twitter account. He noted that the Defendant's account had multiple posts with the following identifying

information: his nickname "Turbo" or a variation thereof, "Follow My Wife @mykiacrutcher," which was the name of his girlfriend and mother of his child, multiple photographs of the Defendant with known associates, and the Defendant's phone number ending in 5038. Detective Hafley confirmed through cell phone records that the cell phone ending in 5038 belonged exclusively to the Defendant. Marcus Banes also confirmed the Defendant's Twitter accounts. Banes referenced a tweet about "Pee-Wee," victim Johnson's nickname, which Detective Hafley confirmed in one of the posts on the Defendant's Twitter feed. Detective Hafley also identified the photograph of the Defendant with a gun in his hand, which was previously identified by Agent Scott as a type of Glock pistol. Detective Hafley acknowledged that he did not know when the photographs on the Defendant's Twitter page were taken. Based on this proof, the trial court mused how the account could possibly belong to anyone other than the Defendant. We agree with the trial court and conclude there was sufficient circumstantial evidence to authenticate the Twitter account and that such Twitter posts were attributable to the Defendant.

Next, the Defendant argues the admissibility of the Twitter posts is governed by Rule 404(b), which generally prohibits prior bad acts or crimes to show action in conformity therewith. However, this court has explained possession of a weapon is not a crime or bad act, and thus does not implicate Rule 404(b). See State v. Robinson, No. M2016-02335-CCA-R3-CD, 2017 WL 4693999, at *2 (Tenn. Crim. App. Oct. 18, 2017) (citing State v. Reid, 213 S.W.3d 792, 813-14 (Tenn. 2006)). As a prerequisite to admissibility here, we must determine whether each written Twitter post and each photograph of the Defendant holding various firearms was relevant, and if so, whether the probative value was substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 401, 403.

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Young, 196 S.W.3d 85, 106 (Tenn. 2006) (citations and internal quotation marks omitted).

We have no hesitation concluding that each written Twitter post was relevant and bore no unfair prejudicial effect. The written post with victim Johnson's nickname "Pee Wee" established familiarity with the offense and alluded to his murder. Another written post showed the phone number ending in 5038, which was critical in establishing the Defendant's identity and involvement in the offenses based on the bulk of cell phone record evidence. The same post further established his identity and connection to the offenses because it was sent to a close associate of the Defendant's, Julius Lanier, who lived near the second crime scene. The final two posts glorify murder or a "hit" in the year 2014, the same year of the instant crimes. There is no question that these posts tended to show that the Defendant was involved with or the perpetrator of the offenses in this case. The trial court did not err in admitting the written Twitter posts.

The admissibility of the photographs presents a closer question. The photograph of the Defendant holding an assault type weapon, which Agent Scott identified was a type of Glock, was clearly admissible because it was consistent with the type of weapon used in the offense. See e.g. State v. Brown, No. M2017-00904-CCA-R3-CD, 2019 WL 1514551, at *56-57 (Tenn. Crim. App. Apr. 8, 2019). However, we fail to see the relevance of the remaining two photographs showing the Defendant holding an assault type rifle and two firearms aimed at the camera. We understand the State's attempt to show identity through the same photos being posted on the variations of the Defendant's Twitter feed. However, the two photographs in question were among many throughout the Defendant's Twitter feed showing the Defendant, a small child, and various friends. The photographs of the Defendant with an assault type weapon and with two weapons aimed at the camera were not connected to the Defendant's involvement in the offenses and were, therefore, unnecessary, misleading, and unfairly prejudicial. See United States v. Hendrix, 52 F.3d 326 (6th Cir. 1995) (noting that "photo seems intended to appeal to jurors' prejudices about the young black men, rather than to their disinterested judgment of [the defendant's] guilt or innocence of the charged crimes" and concluding it was irrelevant because no connection between depictions in photo and defendant's involvement in crime). However, given the overwhelming evidence of the Defendant's guilt in this case, we conclude that the error in the admission of these two photographs was harmless.

**IV. <u>Sufficiency of the Evidence.</u>** Next, the Defendant contends the State failed to prove he acted with the requisite premeditation in the murder of victim Cole, and that he was engaged in a robbery or an attempted robbery in the felony murder of victim Johnson. In response, the State contends the evidence is sufficient to sustain the Defendant's convictions in each homicide. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a

presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As relevant here, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any ... robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 2011). No culpable mental state is required for conviction of felony murder except the intent to commit the underlying felony. Id. § 39-13-202(b) (Supp. 2011). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a). A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101.

First degree murder is defined as "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 2011). Premeditation is defined as:

an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Clayton, 535 829, 845 (Tenn. 2017) (citing State v. Dotson, 450 S.W.3d 1, 86 (Tenn. 2014); State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003)). Factors that may support the existence of premeditation include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, calmness immediately after the killing, and destruction and secretion of evidence of the killing. State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009); State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004); Davidson, 121 S.W.3d at 615; Bland, 958 S.W.2d at 660. In addition, a jury may infer

premeditation from any planning activity by the defendant before the killing, from evidence concerning the defendant's motive, and from proof regarding the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. Deb. 24, 1995) (citation omitted).

Viewing the evidence in the light most favorable to the State, victim Cole was upset with victim Johnson because he was seeing other women. Terrineka Young heard victim Cole say that she wanted to get victim Johnson "set up" or robbed. Young and victim Cole went to the Glenview apartment where the Defendant was staying, and victim Cole went into a room with the Defendant and Shawn Carr. When victim Cole and the Defendant came out of the room, Young heard victim Cole tell the Defendant, "Don't shoot me[,]" and the Defendant replied, "I'm not gonna shoot you." Later that night, victim Johnson was shot and killed. Witnesses who heard the gunshots described seeing a PT cruiser that matched the description of victim Cole's car, and they described a tall, skinny man leaving the crime scene. Cell phone location analysis showed the devices for the Defendant, Cole, and Johnson were all communicating with towers near the Johnson crime scene leading up to the point when the first 911 call was received. Cell phone location analysis further showed the Defendant's device communicating with victim Cole near the area where victim Cole was killed, with the last communication twenty-two minutes before the second 911 call was received.

The Defendant also discussed a "big one" or a robbery a day or two before the offense, which he later confirmed was of victim Johnson. The Defendant told Banes, who had knowledge of the offenses not previously released to the public, that he had killed both victims. The Defendant said he shot victim Johnson through the car and killed victim Cole to silence her. The Defendant's Twitter account also referenced murder and "Smoking on dat Pee-Wee," which was victim Johnson's nickname. The Defendant's principal challenge is to the credibility of Banes. As previously noted, "[q]uestions involving the credibility of witnesses, the weight and value of the evidence, and all factual disputes raised by the evidence are entrusted to the trier of fact. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008); Bland, 958 S.W.2d at 659. Accordingly, the evidence is sufficient to support each conviction in this case. The Defendant is not entitled to relief.

**V. Sentencing.** Finally, the Defendant argues the trial court abused its discretion in imposing consecutive life sentences, and the State disagrees. Where a defendant is convicted of one or more offenses, the trial court has discretion in determining whether the sentences shall be served concurrently or consecutively. Tenn. Code Ann. § 40-35-115(a). "[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013). Tennessee Code Annotated section 40-35-115(b) contains the discretionary criteria for imposing consecutive sentencing. See

also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). Because the criteria for determining consecutive sentencing "are stated in the alternative [,] ... only one [criterion] need exist to support the appropriateness of consecutive sentencing." State v. Mickens, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003). An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102(1); see State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." Tenn. Code Ann. § 40-35-103(2); see Imfeld, 70 S.W.3d at 708.

The trial court imposed consecutive sentencing based on three statutory criteria. Upon finding the Defendant had an extensive criminal history, that he committed the instant offenses while on probation, and that he was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. See Tenn. Code Ann. § § 40-35-115(b)(2), (4), (6). In addition, a recording of a jail phone call was played at sentencing establishing that the Defendant sought retaliation against Banes for his testimony in this case. Based on this proof, the trial court determined that consecutive sentences were necessary to protect the public against further criminal conduct by the Defendant and reasonably related to the seriousness of the offenses committed. The record fully supports the order of the trial court imposing consecutive life sentences for each of the Defendant's convictions of first-degree murder. The Defendant is not entitled to relief.

## CONCLUSION

Discerning no reversible error, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE

- 32 -